IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COACH, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-1733-N |
| | § | |
| INTERNATIONAL BAZAAR INC., *et. al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried before the Court on October 29-31, 2012. All parties appeared through counsel and announced ready for trial. Based on the evidence at trial, the arguments of counsel, and the prior briefing on legal issues, the Court makes the following findings of facts and conclusions of law.

**I. FINDINGS OF FACT**

1.    Plaintiff Coach, Inc. is a Maryland corporation with its principal place of business in New York, New York.

2.    Plaintiff Coach Services, Inc. (collectively with Coach, Inc., "Coach") is a Maryland corporation with its principal place of business in Jacksonville, Florida.

3.    Coach manufactures luxury goods, producing leather and mixed-material products, including handbags, wallets, and accessories such as eyewear, footwear, jewelry, and watches.

ORDER – PAGE 1

4.    Defendant International Bazaar d/b/a Big T Plaza ("Big T Plaza" or "Big T") is a Texas corporation with its principal place of business in Dallas, TX.  It is an indoor market located at 4515 Village Fair Drive in Dallas, TX, where individual tenants sell goods of a leases booths or other leased space.

5.    Defendant James P. Lee is an individual Texas resident that owns and operates Big T Plaza. He is President and 25% owner of Big T Plaza.  Coach has dismissed its claims against Lee.

6.    Defendant Dal W. Nam is an individual Texas resident.  He is the vice president and 15 % owner of Big T Plaza.  Coach has dismissed its claims against Nam.

7.    Defendants Accessory Plaza Incorporated, Zaid Fashion Inc., Accessory Bags, Rayan Plaza Inc., and Hadi Investments, Inc., are all domestic entities that operate at Big T Plaza.

8.    Defendant Cessell Pilgrim is a Texas resident who owns and operates Accessory Plaza.  Pilgrim operated Booths Nos. A22, B32B, and the kiosk behind A-17 at Big T Plaza.  The Court will refer to Pilgrim and Accessory Plaza collectively as the "Pilgrim Defendants."

9.    Defendant Akram Abu-Saqer is a Texas resident who owns and operates Zaid Fashion.  The Court will refer to Abu-Saqer and Ziad Fashion collectively as the "Abu-Saqer Defendants."

10. Defendant Sekou M. Sesay is a Texas resident who owns and operates Accessory Bags. Sesay operated Booth Nos. A2-A3, C7, and the booth between B1 & B2 at Big T Plaza. Sesay failed to answer Coach's complaint.

11. Defendant Chellakh Ahmend is a Texas resident who owns Rayan Fashion, Inc. Ahmed operated Booth No. B-14 at Big T Plaza. The Court will refer to Ahmend and Rayan Fashion collectively as the "Chellakh Defendants."

12. Defendant Khaled Adwi is a Texas resident who owns and operates Hadi Investments, Inc. Adwi operated booth No. B-13 at Big T Plaza. The Court will refer to Adwi and Hadi Investments collectively as the "Adwi Defendants."

13. Coach's trademarks at issue in this action are registered with the U.S. Patent and Trademark Office ("USPTO") and are in full force and effect. Coach's Trademark registration numbers are: (1) 2,088,706; (2) 3,157,972; (3) 0,751,493; (4) 2,451,168; (5) 2,537,004; (6) 1,846,801; (7) 3,439,871; (8) 2,061,826; (9) 2,231,001; (10) 2,836,172; (11) 2,939,127; (12) 3,352,448; (13) 2,446,706; (14) 2,291,341; (15) 1,071,000; (16) 3,633,302; (17) 3,908,558; (18) 3,812,170; (19) 2,534,429; (20) 3,363,873; (21) 2,252,847; (22) 2,291,368; (23) 2,534,429; (24) 2,169,808; (25) 2,045,676; (26) 1,070,999; (27) 1,309,779; (28) 2,035,056; (29) 2,983,654; (30) 2,626,565; (31) 2,822,318; (32) 2,832,589; (33) 2,592,963; (34) 2,822,629; (35) 3,012,585; (36) 3,396,554; (37) 3,784,814; (38) 3,779,466; (39) 3,696,470; (40) 3,251,315; (41) 3,413,536; (42) 3,441,671; (43) 1,664,527; (44) 3,338,048; (45) 3,149,330; (46) 2,161,303; and (47) 2,088,707. These marks are also incontestable.

14.    Coach owns copyright registrations VA-1694574, VA-1010918, VAu-1017000, VA-1699759, VAu-704542, VAu-1034190, VA-0001714051, VAu-001010900, VA-1723169, VA-1748910, VAu-1052013, VAu-1046658, and VAu-1023771.

15.    Big T Plaza is not, and was not, an authorized retailer of Coach products.

16.    No vendor in Big T plaza is, or was, an authorized retailer of Coach products.

17.    The lease agreements between Big T Plaza and its tenants provided that the sale of counterfeit items was a breach of the lease agreement. Big T's leases sometimes prohibited certain tenants from selling certain types of goods.

18.    Big T collected rent from its tenants. It did not receive revenue by other means, such as shares of the tenants' profits, concessions, or parking fees.

19.    Big T Plaza is managed by Ki Ho ("Keith") Song. He is responsible for negotiating leases with tenants, approving tenants for retail space, approving what tenants may sell from their booths, general maintenance and oversight, ensuring rent is paid on time, enforcing leases, and ensuring compliance with lease terms. Song walks Big T Plaza at least twice a week. Although Song did monitor Big T's tenants for lease compliance, he did not control the day-to-day operations of the tenants' businesses.

20.    Big T Plaza has been subject to many criminal seizures of counterfeit goods. Big T has also received multiple letters from various trademark owners notifying it of its tenants' counterfeiting. For example, Nike has sent letters to Big T Plaza regarding counterfeit goods. When Big T Plaza received a specific complaint about a specific tenant, Song would deliver memos to those tenants informing them of the complaint.

21.    On June 25, 2009, investigator Joel Voyles, while conducting a seizure on behalf of Immigration and Customers Enforcement ("ICE") regarding counterfeit CDs and DVDs, told Song that one specific booth, Tora's Lil' Secret, was selling counterfeit Coach bags.  Voyles did not indicate how he knew the goods were counterfeit or provide any supporting information for his claim.  Tora's Lil' Secret is not a defendant in this case.

22.    On June 5, 2010 and June 8, 2010 Coach sent an investigator, Stephanie Voyles, to Big T Plaza.  Voyles discovered over 150 presumably counterfeit bags in two locations of Big T Plaza, Booth B32-B and a Kiosk behind Booth A 17-18, both operated by Pilgrim.

23.    Later that month, on June 14, 2010, Coach sent a letter to Big T Plaza stating that Coach was aware that tenants at the Big T Plaza were "selling, storing, and warehousing counterfeit merchandise bearing the federal registered trademarks for Coach, Inc."  The letter failed to name any specific tenants but stated that "[i]f you facilitate the continuation of this conduct by failing to prevent the ongoing criminal enterprise on your property, Coach intends to hold you responsible for all damages and fees incurred as a result."

24.    Song failed to take any specific action in response to the June 2010 Coach letter.

25.    After Coach sent its letter, Stephanie Voyles returned to investigate Big T Plaza.  On April 2, 2011, Voyles discovered 25-30 apparently counterfeit handbags in Booth 33, operated by Abu-Saqer.  On July 15, 2011, Voyles returned to the premises and noted

a number of vendors selling apparently counterfeit goods. Coach did not report these findings to Big T Plaza. Coach returned on a number of occasions between the time it filed its Original Complaint on July 21, 2011 and the time of trial, documenting surveys and uncover buys of counterfeit product. On July 5, 2012, the Dallas Police Department seized a number of counterfeit products from Big T, including counterfeit Coach goods. The Department specifically seized counterfeit Coach goods from, among others, Tora's Lil' Secret and Chellakh's Rayan Fashion booth.

26.     Song periodically posted signs at Big T Plaza reminding the tenants that selling counterfeit goods was a breach of the lease agreement. Song did not ask the tenants if the merchandise they were selling was counterfeit merchandise.

27.     Song and Big T Plaza actually pursued eviction procedures after receiving specific complaints from Louis Vutton about counterfeit items being sold by specific tenants.

28.     The Abu-Saqer Defendants sold counterfeit items bearing Coach trademarks 2,626,565; 3,696,470; 3,338,048; 3,441,671; 1,071,000; 2,088,707; 1,070,999; 3,414,536; 2,592,963; 3,696,470; 2,231,001; 2,169,808; 3,413,536; 2,626,565; 3,696,470; 3,441,671; 0,751,493; 1,309,779; 2,088,706; and 3,413,536. The Abu-Saqer defendants also sold goods that were substantially similar to Coach registered copyrighted works Nos. VAu 1-023-771 and No. VAu 1-052-013. Abu-Saqer knew his goods were counterfeit.

29.     The Pilgrim Defendants sold counterfeit items bearing Coach trademarks 2,626,565; 3,696,470; 3,338,048; 3,441,671; 1,071,000; 2,088,707; 1,070,999; 3,413,536;

3,012,585; 3,812,170; 2,592,963; 2,231,001; 2,169,808; 2,626,565; 3,696,470; 3,441,671; 0,751,493; 1,309,779; 3,414,536; 2,832,589; 2,451,168; 2,534,429; 2,626,565; 2,088,707; and 1,309,779. The Pilgrim Defendants also sold goods that were substantially similar to Coach registered copyrighted works Nos. VAu 1-010-900 and VA 1-690-189. Pilgrim knew his goods were counterfeit.

30.    The Chellakh Defendants sold counterfeit items bearing Coach trademarks 3,696,470; 3,338,048; 3,441,671; 1,071,000; 2,088,707; 1,070,999; 2,592,963; 3,696,470; 3,441,671; and 2,169,808. Cellakh knew that his goods were counterfeit.

31.    Defendant Sesay sold counterfeit items bearing Coach trademarks 2,626,565; 3,696,470; 3,338,048; 3,441,671; 1,071,000; 2,088,707; 1,070,999; 3,413,536; 2,592,963; 3,696,470; 3,441,671; 2,169,808; 2,626,565; 3,696,470; 3,441,671; 0,751,493; 1,309,779; 3,413,536; 2,832,589; 2,451,168; 3,696,470; 2,169,808; 3,413,536; 2,592,963; 2,088,706; 2,592,963; 2,231,001; 3,696,470; 1,071,000; 1,309,779; 3,696,470. Sesay also sold goods that were substantially similar to Coach registered copyrighted work No. VAu 1-023-771. Sesay knew his goods were counterfeit.

32.    The Adwi Defendants sold counterfeit items bearing Coach trademarks 3,696,470; 3,338,048; 3,441,671; 1,071,000; 2,088,707; 1,070,999; and 3,413,536. Adwi knew that his goods were counterfeit.

33.    None of these defendants was evicted for sale of counterfeit Coach merchandise.

34.   Neither Song nor Big T Plaza had actual knowledge that the goods in question were counterfeit.

35.   Coach teaches its investigators that in determining whether a good is counterfeit, one should look to the location of the goods, the price of the goods, the quality of the goods, and the volume of product at a given location. Coach's representative also testified that it is helpful to look at the lining or hardware of the product. But Coach failed to provide this information to Song. Coach's letter did not state that no one at Big T Plaza is an authorized Coach retailer, and it did not mention any of the other specific traits that Coach trains its investigators to look for when determining whether goods are counterfeit. Coach offered no evidence that Song knew of the particular ways in which to tell a Coach product may be counterfeit – price, volume, location, quality, and the like – and thus fails to prove that Song knew or should have known that any particular Coach good was counterfeit. Coach also failed to prove that Song actually examined the quality of any counterfeit item.

36.   Song may have had suspicions that the goods were counterfeit, but he felt that he did not have the expertise to determine whether goods were indeed counterfeit.

37.   Song and Big T were not willfully blind to counterfeiting. Although Song testified that he did not ask specific tenants whether their goods were counterfeit for fear of liability, Song read the complaints sent to him by trademark owners. Song and Big T did take action based on specific complaints and even attempted to evict some tenants based on specific complaints from other trademark owners.

38.    Coach possessed information enabling it to place Song and Big T Plaza on more specific notice regarding specific tenants but chose not to do so. It did this to coopt Song and Big T Plaza into taking an active role in policing Big T Plaza for counterfeit Coach goods.

39.    All findings of fact that are more properly viewed as conclusions of law are also adopted by the Court as conclusions of law.

## II. CONCLUSIONS OF LAW

1.    To prevail on a trademark infringement claim, Coach must establish a likelihood of confusion. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-26 (5th Cir. 2010). In the case of counterfeit marks, likelihood of confusion is clear. *See Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 995, 1007 n.11 (S.D. Tex. 2000).

2.    To prove copyright infringement, Coach must show that it owns a valid copyright and that the defendant copied its work without authorization. *See Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 395 (5th Cir. 2001). Because direct evidence of factual copying is rarely available, copying may be inferred by proof that the defendant had access to the copyrighted work prior to the creation of the infringing work and that the questioned work is substantially similar to the copyrighted work. *Id.*

3.    All of the Tenant Defendants had access to Coach's copyrights via their availability in the market. *See id.* (citing *Odegard, Inc v. Costikyan Classic Carpets, Inc.*, 963 F. Supp. 1328, 1332 (S.D.N.Y. 1997)). Because the Court has previously found that the

Abu-Saqer Defendants, the Pilgrim Defendants, and Sesay sold goods that were substantially similar to Coach's copyrighted works, the Court infers that these defendants factually copied Coach's copyrighted works.

### A. The Tenant Defendants Are Liable for Infringement

4. The Pilgrim Defendants, Abu-Saqer Defendants, Cellakh Defendants, Adwi Defendants, and Sesay all infringed Coach's trademarks. The Pilgrim Defendants, Abu-Saqer Defendants and Sesay also infringed Coach's copyrighted works.

5. The Lanham Act allows trademark infringement plaintiffs to elect statutory damages for any use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services. 15 U.S.C. § 1117(c).

6. Coach may recover "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." *Id.* If the counterfeiting was "willfull," the maximum award is increased to $2,000,000 per mark per type of good. *Id.* § 1117(c)(2).

7. Statutory damages are available in copyright cases also. 15 U.S.C. § 504(a). Statutory damages may be awarded in an amount between $750 and $30,000 per infringement. 17 U.S.C. § 504(c)(1). In cases involving multiple infringements and multiple infringed works, "the total number of 'awards' of statutory damages . . . that a plaintiff may recover in any given action depends on the number of *works* that are infringed . . . regardless of the number of *infringements* of those works." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) (emphasis in original).

8.    In both trademark and copyright cases, a defendant acts willfully if he or she knows that his actions constitute infringement. *See Coach, Inc. v. Brightside Boutique*, No. 1:11-CA-20 LY, 2012 WL 32941, at *4 (W.D. Tex. Jan. 6, 2012) (trademark); *EMI April Music v. Jet Rumeurs, Inc.*, 632 F. Supp. 2d 619, 624-25 (N.D. Tex. 2008) (copyright). The Pilgrim Defendants, Abu-Saqer Defendants, Cellakh Defendants, Adwi Defendants, and Sesay all admitted to knowing that their Coach goods were counterfeit. Accordingly, their infringement was willful.

9.    In determining statutory damages in both trademark and copyright infringement cases, the Court considers (1) whether the defendant's conduct was innocent or willful; (2) the expenses saved and profits reaped; (3) the revenue lost by the plaintiff; (4) whether a defendant cooperated in providing particular records from which to assess the value of the infringing material produced; (5) the value of the copyright or mark; (6) the potential for discouraging the defendant; and (7) the deterrent effect on others besides the defendant. *Philip Morris USA, Inc. v. Lee*, 547 F. Supp. 2d 685, 696 (W.D. Tex. 2008). Courts also look to the size of a defendant's counterfeiting operations. *Id.* at 696.

10.    The Court finds that a $10,000 mark-per-good, and a $10,000 per infringement, statutory damage award is appropriate as to the Pilgrim Defendants. Although the Pilgrim Defendants acted willfully and Coach's copyrights and trademarks are valuable, the other factors tilt toward a smaller statutory damage award. First, Coach's lost profits from the sale of these counterfeit goods are likely negligible

because customers purchasing counterfeit Coach bags at Big T are unlikely to purchase an authentic Coach bag at an authorized retailer for normal market prices. Further, during the August 5, 2011 seizure, Coach discovered 707 counterfeit Coach items. Assuming this is representative of the numbers of counterfeit Coach items at any given time, the Pilgrim Defendants' store is not a particularly large scale operation. Finally, Coach fails to offer any real evidence of the unlawful profits that the Pilgrim Defendants obtained from counterfeit Coach sales. The Court certainly recognizes that Coach's inability to determine the Pilgrim Defendants' profits is perhaps due in large part to their failure to keep records, and the Court also recognizes that some enhancement is necessary to deter infringement by the Pilgrim Defendants and others in the future. But the most expensive counterfeit Coach item purchased from the Pilgrim Defendants was only a $40.00 handbag. Coach itself characterized the Big T Tenants' prices as "rock bottom." Thus, the Court finds that a $10,000 mark-per-good and a $10,000 per copyright infringement statutory damage award is appropriate as to the Pilgrim Defendants.

11.    The Pilgrim Defendants willfully infringed ten Coach trademarks on counterfeit handbag and cross-body bags, three trademarks on footwear, six trademarks on wallets, three trademarks on sunglasses, and three trademarks on wristlets, for a total mark-per-good infringement total of 25. The Pilgrim Defendants also willfully infringed two Coach copyrights. Accordingly, the Court orders the Pilgrim

Defendants to pay $250,000 for their 25 mark-per-good infringements and $20,000 for their two copyright infringements, for a total of $270,000.

12.    The Court finds that a $7500 mark-per-good, and a $7500 per infringement, statutory damage award is appropriate as to the Abu-Saqer Defendants. Although the Abu-Saqer Defendants acted willfully and Coach's copyrights and trademarks are valuable, the other factors tilt toward a smaller statutory damage award.  As mentioned, Coach's lost profits from the sale of these counterfeit goods are likely negligible because customers purchasing counterfeit Coach bags at Big T are unlikely to purchase an authentic Coach bag at an authorized retailer for normal market prices. Further, during the August 5, 2011 seizure, Coach discovered 380 counterfeit Coach items. Assuming this is representative of the numbers of counterfeit Coach items at any given time, the Pilgrim Defendants' store is not a particularly large scale operation.  Finally, Coach fails to offer any real evidence of the unlawful profits that the Abu-Saqer Defendants obtained from counterfeit Coach sales.   The Court certainly recognizes that Coach's inability to determine the Abu-Saqers' profits is perhaps due in large part to their failure to keep records, and the Court also recognizes that some enhancement is necessary to deter infringement by the Abu-Saqer Defendants and others in the future.  But the most expensive counterfeit Coach item purchased from the Abu-Saqer Defendants was also only a $40.00 handbag.  Coach itself characterized the Big T Tenants' prices as "rock bottom."  Thus, the Court finds

that a $7500 mark-per-good and a $7500 per copyright infringement statutory damage award is appropriate as to the Abu-Saqer Defendants.

13.    The Abu-Sager Defendants willfully infringed eight trademarks on counterfeit handbags and cross-body bags, six trademarks on footwear, six trademarks on wallets, three trademarks on scarves, two trademarks on hats, and two trademarks on wristlets, for a total mark-per-good infringement total of 28.    The Abu-Saqer Defendants willfully infringed two Coach copyrights.    Accordingly, the Court orders the Abu-Saqer Defendants to pay $210,000 million for their 28 mark-per-good infringements and $15,000 for their two copyright infringements, for a total of $225,000.

14.    The Court finds that a $10,000 mark-per-good, and a $10,000 per infringement, statutory damage award is appropriate as to Sesay. Although the Sesay acted willfully and Coach's copyrights and trademarks are valuable, the other factors tilt toward a smaller statutory damage award.  As mentioned, Coach's lost profits from the sale of these counterfeit goods are likely negligible because customers purchasing counterfeit Coach bags at Big T are unlikely to purchase an authentic Coach bag at an authorized retailer for normal market prices.  Further, during the August 5, 2011 seizure, Coach discovered 791 counterfeit Coach items.    Assuming this is representative of the numbers of counterfeit Coach items at any given time, the Pilgrim Defendants' store is not a particularly large scale operation.  Finally, Coach fails to offer any real evidence of the unlawful profits that Sesay made from counterfeit Coach sales.  The Court certainly recognizes that Coach's inability to determine the Sesay's profits is

perhaps due in large part to Sesay's failure to keep records, and the Court also recognizes that some enhancement is necessary to deter infringement by the Pilgrim Defendants and others in the future. But the most expensive counterfeit Coach item purchased from the Sesay Defendants was also only a $25.00 hip-bag. Coach itself characterized the Big T Tenants' prices as "rock bottom." Thus, the Court finds that a $10,000 mark-per-good and a $10,000 per copyright infringement statutory damage award is appropriate as to Sesay.

15. Sesay willfully infringed 8 trademarks on counterfeit handbags and cross-body bags, 4 trademarks on footwear, 6 trademarks on wallets, 2 trademarks on sunglasses, 4 trademarks on scarves, 2 trademarks on hats, 3 trademarks on belts, and 3 trademarks on wristlets, for a total mark-per-good infringement total of 32. Sesay also willfully infringed on one Coach copyright. Accordingly, the Court orders the Sesay to pay $320,000 for his 32 mark-per-good infringements and $10,000 for his one copyright infringement, for a total statutory award of $330,000.

16. The Court finds that a $1,000 mark-per-good statutory damage award is appropriate as to the Chellakh Defendants. Although the Chellakh Defendants acted willfully and Coach's copyrights and trademarks are valuable, the other factors tilt toward a smaller statutory damage award. As mentioned, Coach's lost profits from the sale of these counterfeit goods are likely negligible because customers purchasing counterfeit Coach bags at Big T are unlikely to purchase an authentic Coach bag at an authorized retailer for normal market prices. Further, during the August 5, 2011 seizure, Coach

discovered only five counterfeit Coach items. Assuming this is representative of the numbers of counterfeit Coach items at any given time, the Chellakh Defendants' store is a very small operation. Finally, Coach fails to offer any real evidence of the unlawful profits that the Chellakh Defendants made from counterfeit Coach sales. The Court certainly recognizes that Coach's inability to determine the Chellakh Defendants' profits is perhaps due in large part to their failure to keep records, and the Court also recognizes that some enhancement is necessary to deter infringement by the Chellakh Defendants and others in the future. But the most expensive counterfeit Coach item purchased from the Chellakh Defendants was also only a $35.00 pair of shoes. Coach itself characterized the Big T Tenants' prices as "rock bottom." Thus, the Court finds that a $1,000 mark-per-good and a $1,000 per copyright infringement statutory damage award is appropriate as to the Chellakh Defendants.

17. The Cellakh Defendants willfully infringed 6 trademarks on counterfeit handbags and 4 trademarks on counterfeit footwear for a total mark-per-good infringement of 10. Accordingly, the Court orders the Cellakh Defendants to pay Coach a statutory damages award of $10,000.

18. The Court finds that a $1,000 mark-per-good statutory damage award is appropriate as to the Adwi Defendants. Although the Adwi Defendants acted willfully and Coach's copyrights and trademarks are valuable, the other factors tilt toward a smaller statutory damage award. As mentioned, Coach's lost profits from the sale of these counterfeit goods are likely negligible because customers purchasing counterfeit

Coach bags at Big T are unlikely to purchase an authentic Coach bag at an authorized retailer for normal market prices. Coach failed to seize any goods from the Adwi Defendants, and, indeed, Coach's investigators estimated only ten counterfeit Coach product at the Adwi Defendants' store during Coach's one undercover buy. Assuming this is representative of the numbers of counterfeit Coach items at any given time, the Adwi Defendants' store is a very small operation. Finally, Coach fails to offer any real evidence of the unlawful profits that the Cheallakh Defendants made from counterfeit Coach sales. The Court certainly recognizes that Coach's inability to determine the Adwi Defendants' profits is perhaps due in large part to their failure to keep records, and the Court also recognizes that some enhancement is necessary to deter infringement by the Adwi Defendants and others in the future. But the most expensive counterfeit Coach item purchased from the Abu-Saqer Defendants was also only a $45.00 handbag. Coach itself characterized the Big T Tenants' prices as "rock bottom." Thus, the Court finds that a $1,000 mark-per-good and a $1,000 per copyright infringement statutory damage award is appropriate as to the Adwi Defendants.

19.    The Adwi Defendants willfully infringed 7 trademarks on counterfeit handbags for a total mark-per-good infringement of 7. Accordingly, the Court orders the Adwi Defendants to pay Coach a statutory damages award of $7,000.

### B. Big T Is Not Liable for Contributory Infringement

20. Big T Plaza did not directly infringe Coach's trademarks. However, a landlord may be found liable for contributing to tenants' trademark infringement if the landlord continues to supply space even though the landlord knows or has reason to know about trademark violations. *Hard Rock Café Licensing Corp. v. Concession Servs. Inc.*, 955 F.2d 1143,1149 (7th Cir. 1992). Landlords have no duty to seek out and prevent violations, but they may not be "wilfully blind" to such violations. *Id.*

21. For contributory infringement in the services context, a defendant must maintain sufficient control over the direct infringer to warrant imposing liability. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).

22. The level of knowledge required for contributory trademark infringement is high. Liability requires "more than a general knowledge or reason to know that its service is being used to sell counterfeit goods." *Tiffany (NJ), Inc. v. eBay, Inc.*, 600 F.3d 93, 107 (2d Cir. 2010). Rather, the landlord must have some contemporary knowledge of specific tenants that are infringing. *See id.* at 109.

23. From Coach's cease-and-desist letter, Song and Big T Plaza had general knowledge that some Big T Tenants were likely infringing on Coach's trademarks and copyrights.

24. From previous criminal seizures, Song and Big T Plaza had knowledge of specific tenants that sold counterfeit items in the past, including Chellkah and Rayan Fashion, but they did not have specific knowledge that these tenants continued to sell

ORDER – PAGE 18

counterfeit goods. *Cf. Tiffany*, 600 F.3d at 100 (describing eBay's typical "three strikes" rule for alleged trademark infringement).

25.   Song and Big T Plaza did not have specific knowledge of specific tenants' infringement and thus are not liable for contributory trademark infringement. Coach may not force Song and Big T Plaza to enforce Coach trademarks by sending a letter to Big T Plaza informing it that unspecified infringement is occurring on the premises. Coach further must provide some means, even simple ones, for a landlord to determine whether goods are counterfeit.

26.   Coach's letter was too vague to put Big T sufficiently on notice to warrant imposition of contributory liability.

27.   Coach treats the tests for contributory trademark and contributory copyright infringement identically, and thus, the Court declines to address any other tests for indirect copyright infringement.

### C.  Other Relief

28.   For the intentional and knowing use of a counterfeit mark in the sale or offering for sale of goods, the Court must award a reasonable attorneys' fee. 15 U.S.C. § 1117(b)(1). Accordingly, the Court grants Coach's request for attorney's fees from the willful infringers – the Pilgrim Defendants, the Abu-Saqer Defendants, the Adwi Defendants, the Cellakh Defendants, and Sesay.

29.   The Court also agrees that Coach is entitled to injunctive relief against the Pilgrim Defendants, the Abu-Saqer Defendants, the Pilgrim Defendants, the Abu-Saqer

Defendants, the Adwi Defendants, the Cellakh Defendants, and Sesay.  The Lanham Act provides that injunctive relief may be granted to "prevent the violation of any right of the registrant of a registered mark." 15 U.S.C. § 1116(a).  A plaintiff seeking injunctive relief must show (1) an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay, Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "[W]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's good or services constitutes an immediate and irreparable injury." *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d. 810, 831 (S.D. Tex. 1999) (citing cases).  Coach has shown valid, incontestable trademarks.  Coach has shown that all defendants, with the except of Big T Plaza, have created a likelihood of confusion through the willfull and intentional use of counterfeit Coach marks.  This irreparable injury may not be remedied with money, and thus Coach has no adequate legal remedy.  The balance of hardships tips toward Coach because an injunction would only serve to force compliance with the law.  The Court finds that the public interest would not be disserved.  The Court thus permanently enjoins the Pilgrim Defendants, the Abu-Saqer Defendants, The Adwi Defendants, the Cellakh Defendants, and Sesay from further infringing on Coach trademarks and copyrights.

30.    All conclusions of law that are more properly viewed as findings of fact are also

adopted by the Court as findings of fact.

Signed June 7, 2013.

David C. Godbey
United States District Judge